**GRANT & EISENHOFER P.A.**
M. ELIZABETH GRAHAM (Cal. Bar No. 143085)
2325 Third Street, Suite 329
San Francisco, CA 94107
Telephone: (415) 229-9720
Email: egraham@gelaw.com

JENNIFER SARNELLI (Cal. Bar. No. 242510)
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: (646) 722-8504
Email: jsarnelli@gelaw.com

Counsel for Plaintiffs
(Additional Counsel listed on Signature Page)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT BERLINGER, ROBERT DUXLER, FRANCESCA HAMMERSMITH, MARIA KHANGI, PHYLICIA WASHINGTON and BIANCA WEINS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DRISCOLL'S, INC.,<br><br>Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violation of Illinois Consumer Fraud and Deceptive Practices Act, (815 Ill. Comp. Stat. § 505/1, *et seq.*)<br><br>2. Violations of New York's Deceptive Practices Act, (N.Y. Gen. Bus. Law § 349)<br><br>3. Violations of New York's Deceptive Practices Act, (N.Y. Gen. Bus. Law § 350)<br><br>4. Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8 1 *et seq.*<br><br>5. Violation of Massachusetts General Laws Chapter 93A, §§ 2 & 9<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Robert Berlinger, Robert Duxler, Francesca Hammersmith, Maria Khangi, Phylicia Washington, and Bianca Weins (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys allege the following against Defendant Driscoll's, Inc. ("Driscoll's" or "Defendant"), upon personal knowledge as to

Plaintiffs' own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by counsel. Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Classes (as defined herein), including an order requiring Driscoll's to disclose the presence of Per-and Polyfluoroalkyl substances ("PFAS") in its strawberry products ("Strawberries"),[1] as well as the material health and environmental risks associated with PFAS exposure, and restoring to Class members the monies they paid as a result of Defendant's unlawful conduct.  Plaintiffs bring this consumer protection action under the laws of Illinois, Massachusetts, New Jersey, and New York, to remedy Defendant's unlawful, deceptive, and misleading conduct.

## I.    NATURE OF THE ACTION

1.    This consumer protection class action arises from Driscoll's marketing, labeling, and sale of Strawberries that it represents to consumers as being produced "subject to rigorous food safety and quality standards" while failing to disclose the presence, risk of, and/or use of persistent fluorinated pesticide compounds associated with so-called "forever chemicals" and PFAS-related compounds. At the same time, Driscoll's ran an environmentally friendly campaign—greenwashing its true farming and manufacturing practices that included these forever chemicals known to be extraordinarily difficult to clean up and break down and accumulate in the environment and living organisms, including humans.

2.    Driscoll's does not market its Strawberries as a mere agricultural commodity. For decades, Driscoll's has invested tens of millions of dollars cultivating a brand synonymous with exceptional quality, safety, scientific innovation, and consumer trust. As the world's largest berry company, Driscoll's identifies food safety as its "single most important focus" and promotes extensive oversight measures, including pesticide controls, testing protocols, third-party audits, water monitoring, and quality assurance programs designed to ensure consumers receive the "freshest, safest, [and] most flavorful" berries.[2]

---

[1] This action concerns Defendant's conventional strawberry products ("Strawberries") and does not challenge Defendant's separately marketed organic strawberry products.

[2] Driscoll's, *Food Standards for Berries*, https://www.driscolls.com/about/Our-Practices/Food-Safety (last visited June 24, 2026).

3.      Consistent with that brand identity, Driscoll's prominently markets its products as "Only the Finest Berries," a trademarked slogan displayed on its iconic bright-yellow packaging and throughout its advertising.[3]



4.      Through these and numerous other representations and misleading partial disclosures described below, Driscoll's conveys to Plaintiffs and other reasonable consumers that its Strawberries are produced pursuant to food-safety and quality standards exceeding those associated with ordinary produce. These representations are central to Driscoll's branding and consumer appeal because modern consumers increasingly pay premium prices for foods (especially fruit and berries) that they believe are safer, cleaner, and subject to heightened quality controls. As shown by a survey published by Pew Research, 93% of consumers are concerned about the presence of harmful chemicals, such as PFAS, in their food.[4]

---

[3]      Driscoll's,      *Strawberry      Sweetness      Worth      Sharing*, https://www.driscolls.com/Berries/Strawberries (last visited June 24, 2026).

[4] Jennifer McPartland, *Americans are concerned about harmful chemicals in food, water and everyday products*, PEW RSCH. (Feb. 26, 2026), https://www.pew.org/en/research-and-analysis/articles/2026/02/26/americans-are-concerned-about-harmful-chemicals-in-food-water-and-everyday-products (93% of respondents indicated they were very, somewhat, or a little concerned about themselves or their loved ones being exposed to harmful chemicals in their food).

CLASS ACTION COMPLAINT





5.      Further, the same survey shows that 83% of consumers want companies to tell them more about what chemicals are in their products so that they can make informed choices.[5]

---

[5] *Id*. (83% of respondents chose the statement, "I want companies to tell me more about what chemicals are in their products so that I can make informed choices," as best describing what they think).

6.    Driscoll's also highlights its focus on sustainability and ensuring water conservation and quality in its farming practices, representing to consumers that "[w]e see economic performance as inseparable from social and environmental performance. This concept is commonly referred to as the Triple Bottom Line," despite knowing it uses harmful PFAS in its farming practices.

7.    Driscoll's focus on sustainability is unsurprising because it knows that reasonable consumers care about sustainability and will pay a premium for sustainably produced products. In 2024, PricewaterhouseCoopers published a survey that found that consumers would spend 9.7% more, on average, for sustainably produced or sourced goods, despite inflation and cost-of-living concerns.[6] Likewise, another market watch group concluded that "American consumers have spoken. They want to work with sustainable businesses, and they're willing to pay more for sustainable products and services."[7]



---

[6] PricewaterhouseCoopers, *Consumers willing to pay 9.7% sustainability premium, even as cost-of-living and inflationary concerns weigh: PwC 2024 Voice of the Consumer Survey* (May 15, 2024), *at* https://www.pwc.com/gx/en/news-room/press-releases/2024/pwc-2024-voice-of-consumer-survey.html.

[7] PDI Technologies, *Report Shows Consumers Want Sustainable Products* (Apr. 26, 2023), https://pditechnologies.com/resources/report/2023-business-sustainability-index/?utm_source=prnewswire&utm_medium=press-release&utm_campaign=bosi-2023.

8.     Similarly, a survey conducted by NIQ found that 77% of respondents would stop purchasing from a brand if it was found guilty of greenwashing.[8]



9.     In the end, and contrary to its representations and misrepresentations, independent testing detected PFAS compounds in Driscoll's Strawberries. PFAS, often referred to as "forever chemicals," have become the subject of increasing scientific and consumer scrutiny due to their resistance to degradation, tendency to bioaccumulate, and adverse health effects associated with exposure.

10.     Reasonable consumers do not expect that premium Strawberries that Driscoll marketed through extensive representations concerning safety, quality control, purity, and rigorous oversight would contain PFAS residues or PFAS-related compounds. Nor do they expect that products promoted as meeting exceptional food-safety standards would expose them to compounds associated with the growing global concern surrounding "forever chemicals."

---

[8] NIQ, *How to turn green consumer intentions into sustainable actions* (Sept. 26, 2023), https://nielseniq.com/global/en/insights/report/2023/how-to-turn-green-consumer-intentions-into-sustainable-actions/.

CLASS ACTION COMPLAINT

11.     Had Plaintiffs and consumers known the true facts concerning the Strawberries, including the presence and/or use of PFAS-related compounds, they would not have purchased the products or would have paid significantly less for them.

12.     Driscoll's knew, or at minimum should have known, that information concerning PFAS-related compounds in its Strawberries was material to reasonable consumers. Driscoll's likewise knew that PFAS have become the subject of extensive public scientific, and regulatory scrutiny concerning their potential effects on human health and the environment.

13.     That knowledge is further evidenced by allegations made by a former Driscoll's employee responsible for pesticide compliance and food safety. The former Manager of Food Safety and Regulatory Compliance for the United States and Canada (the "Whistleblower"), alleges that Driscoll's management knew of pesticide compliance issues involving strawberries sold under the Driscoll's brand, yet instructed employees to prioritize protecting the Driscoll's brand and preserving the company's "plausible deniability" rather than addressing or escalating those issues. The Whistleblower further alleges that, after refusing to participate in efforts to conceal or minimize those pesticide compliance issues, he was subjected to disciplinary action that ultimately culminated in the termination of his employment.[9]

14.     Despite possessing superior knowledge regarding its farming practices and the use of pesticides containing PFAS, Driscoll's does not disclose the presence, use, or risk of PFAS-related compounds on its Strawberry packaging, labeling, or point-of-sale marketing. Instead, it affirmatively promotes its Strawberries as "Only the Finest Berries" and emphasizes its rigorous food-safety and quality standards.

15.     This action concerns Driscoll's misleading partial disclosures and failure to disclose material information that directly contradicts the premium safety, quality, and purity message it chose to convey to consumers. Having elected to market its Strawberries as subject to exceptional food-safety and quality controls, Driscoll's had a duty to disclose facts that would materially alter how a reasonable consumer understood those representations.

---

[9] *See Harada v. Driscoll's Inc.*, No. 2026-68656 (Cal. Super. Ct., Ventura Cnty. June 24, 2026).

CLASS ACTION COMPLAINT

## II. THE PARTIES

### A. PLAINTIFFS

16. Plaintiff Robert Berlinger ("Berlinger") is, and at all relevant times has been, a resident of New Jersey.

17. Berlinger purchased Driscoll's Strawberries weekly at his local Shop Rite and Stop & Shop supermarkets. Berlinger's most recent purchase of Driscoll's Strawberries was in early June, 2026. In making those purchases, Berlinger reviewed and relied upon Driscoll's packaging, labeling, marketing, and other representations emphasizing the quality, safety, rigorous standards, and trustworthiness associated with Defendant's Strawberries and brand. Through these representations, Defendant conveyed that the Strawberries were suitable for consumption and met reasonable consumer expectations regarding safety and quality. Consistent with those representations and partial disclosures, Berlinger believed that Driscoll's Strawberries were free from undisclosed contaminants and substances that reasonable consumers seek to avoid. Berlinger subsequently learned from news sources, including social media posts, that the Strawberries were contaminated with PFAS-related compounds or persistent fluorinated pesticides. Berlinger did not expect that the Strawberries would contain or be produced using PFAS-related compounds or persistent fluorinated pesticides. Had Driscoll's disclosed these facts, Berlinger would not have purchased the Strawberries or would have paid less for them. He would purchase the Strawberries again if they were free from PFAS contamination.

18. Plaintiff Robert Duxler ("Duxler") is, and at all relevant times has been, a resident of Illinois.

19. Duxler purchased Driscoll's Strawberries from his local Woodman's and Jewel Osco supermarkets or Costco. Duxler's most recent purchase was in late May, 2026. In making those purchases, Duxler reviewed and relied upon Driscoll's packaging, labeling, marketing, and other representations emphasizing the quality, safety, rigorous standards, and trustworthiness associated with Defendant's Strawberries and brand. Through these representations, Defendant conveyed that the Strawberries were suitable for consumption and met reasonable consumer expectations regarding safety and quality. Consistent with those representations and partial

CLASS ACTION COMPLAINT

disclosures, Duxler believed that Driscoll's Strawberries were free from undisclosed contaminants and substances that reasonable consumers seek to avoid. Duxler subsequently learned from news sources, including an online article, that the Strawberries were contaminated with PFAS-related compounds or persistent fluorinated pesticides. Duxler did not expect that the Strawberries would contain or be produced using PFAS-related compounds or persistent fluorinated pesticides. Had Driscoll's disclosed these facts, Duxler would not have purchased the Strawberries or would have paid less for them. He would purchase the Strawberries again if they were free from PFAS contamination.

20. Plaintiff Francesca Hammersmith ("Hammersmith") is, and at all relevant times has been, a resident of Illinois.

21. Hammersmith purchased Driscoll's Strawberries weekly, purchasing two or three cartons at a time from her local Costco, and also occasional purchases from ALDI and Jewel Osco. Hammersmith's most recent purchase was in early June, 2026. In making those purchases, Hammersmith reviewed and relied upon Driscoll's packaging, labeling, marketing, and other representations emphasizing the quality, safety, rigorous standards, and trustworthiness associated with Defendant's Strawberries and brand. Through these representations, Defendant conveyed that the Strawberries were suitable for consumption and met reasonable consumer expectations regarding safety and quality. Consistent with those representations and partial disclosures, Hammersmith believed that Driscoll's Strawberries were free from undisclosed contaminants and substances that reasonable consumers seek to avoid. Hammersmith subsequently learned from news sources, including a social media post, that the Strawberries were contaminated with PFAS-related compounds or persistent fluorinated pesticides. Hammersmith did not expect that the Strawberries would contain or be produced using PFAS-related compounds or persistent fluorinated pesticides. Had Driscoll's disclosed these facts, Hammersmith would not have purchased the Strawberries or would have paid less for them. She would purchase the Strawberries again if they were free from PFAS contamination.

22. Plaintiff Maria Khangi ("Khangi") is, and at all relevant times has been, a resident of New York.

CLASS ACTION COMPLAINT

23. Khangi purchased Driscoll's Strawberries from her local Wegmans, ALDI, Target, and Sam's Club stores. Khangi's most recent purchase of Driscoll's Strawberries was in late May, 2026. In making those purchases, Khangi reviewed and relied upon Driscoll's packaging, labeling, marketing, and other representations emphasizing the quality, safety, rigorous standards, and trustworthiness associated with Defendant's Strawberries and brand. Through these representations, Defendant conveyed that the Strawberries were suitable for consumption and met reasonable consumer expectations regarding safety and quality. Consistent with those representations and partial disclosures, Khangi believed that Driscoll's Strawberries were free from undisclosed contaminants and substances that reasonable consumers seek to avoid. Khangi subsequently learned from news sources, including a social media post, that the Strawberries were contaminated with PFAS-related compounds or persistent fluorinated pesticides. Khangi did not expect that the Strawberries would contain or be produced using PFAS-related compounds or persistent fluorinated pesticides. Had Driscoll's disclosed these facts, Khangi would not have purchased the Strawberries or would have paid less for them. She would purchase the Strawberries again if they were free from PFAS contamination.

24. Plaintiff Phylicia Washington ("Washington") is, and at all relevant times has been, a resident of Illinois.

25. Washington purchased Driscoll's Strawberries at her local Meijer's, ALDI, Walmart, or Hy-Vee supermarket and through online, same-day delivery services. Washington purchased Driscoll's Strawberries every few days, often in four or five cartons at a time. In making those purchases, Washington reviewed and relied upon Driscoll's packaging, labeling, marketing, and other representations emphasizing the quality, safety, rigorous standards, and trustworthiness associated with Defendant's Strawberries and brand. Through these representations, Defendant conveyed that the Strawberries were suitable for consumption and met reasonable consumer expectations regarding safety and quality. Consistent with those representations and partial disclosures, Washington believed that Driscoll's Strawberries were free from undisclosed contaminants and substances that reasonable consumers seek to avoid. Washington subsequently learned from news sources, including a social media post, that the

10

CLASS ACTION COMPLAINT

Strawberries were contaminated with PFAS-related compounds or persistent fluorinated pesticides. Washington did not expect that the Strawberries would contain or be produced using PFAS-related compounds or persistent fluorinated pesticides. Had Driscoll's disclosed these facts, Washington would not have purchased the Strawberries or would have paid less for them. She would purchase the Strawberries again if they were free from PFAS contamination.

26. Plaintiff Bianca Weins ("Weins") is, and at all relevant times has been, a resident of Massachusetts.

27. Weins purchased Driscoll's Strawberries from her local Big Y and Stop & Shop supermarkets. Weins most recently purchased Driscoll's Strawberries on May 20, 2026. In making those purchases, Weins reviewed and relied upon Driscoll's packaging, labeling, marketing, and other representations emphasizing the quality, safety, rigorous standards, and trustworthiness associated with Defendant's Strawberries and brand. Through these representations, Defendant conveyed that the Strawberries were suitable for consumption and met reasonable consumer expectations regarding safety and quality. Consistent with those representations and partial disclosures, Weins believed that Driscoll's Strawberries were free from undisclosed contaminants and substances that reasonable consumers seek to avoid. Weins subsequently learned from news sources, including a social media post, that the Strawberries were contaminated with PFAS-related compounds or persistent fluorinated pesticides. Weins did not expect that the Strawberries would contain or be produced using PFAS-related compounds or persistent fluorinated pesticides. Had Driscoll's disclosed these facts, Weins would not have purchased the Strawberries or would have paid less for them. She would purchase the Strawberries again if they were free from PFAS contamination.

B. **DEFENDANT**

28. Defendant Driscoll's, Inc., formerly known as Driscoll Strawberry Associates, Inc., is a California corporation with its principal place of business in Watsonville, California. Defendant, a berry juggernaut, regularly conducts business throughout California and in this judicial district.

11

CLASS ACTION COMPLAINT

## III.   JURISDICTION AND VENUE

29.     This Court has subject-matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one Class member is a citizen of a state different from Defendant. On information and belief, the proposed Class consists of more than 100 members. The Court also has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

30.     This Court has personal jurisdiction over Defendant Driscoll's, Inc. because it is a California corporation with its principal place of business in Watsonville, California, which is located in this District. Defendant is therefore subject to general jurisdiction in this District.

31.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant resides in this District, including by maintaining its principal place of business in Watsonville, California. Venue is also proper under § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## IV.   FACTUAL ALLEGATIONS

### A.   THE HISTORY OF DRISCOLL'S STRAWBERRIES

32.     Driscoll's is a California-based seller and marketer of fresh Strawberries and other berries. Founded in the late nineteenth century, the company is the world's largest berry producer, now controlling at least one-third of the $9 billion U.S. berry market. Strawberries are Driscoll's most popular berry.

33.     Driscoll's operates a vertically coordinated berry business built around proprietary plant genetics, exclusive licensing arrangements, and a network of approved growers. Rather than cultivating all berries itself, Driscoll's develops and owns patented and proprietary berry varietals, which it licenses exclusively to growers that satisfy Driscoll's standards and contractual requirements. Through this model, Driscoll's exercises substantial control over berry production, cultivation practices, quality standards, harvesting protocols, packaging, branding, and distribution, even where independent growers perform the physical farming operations.

CLASS ACTION COMPLAINT

34.     Driscoll's began in California in the late 1800s when Ed Reiter and his brother-in-law, Dick Driscoll, started growing Strawberries near Watsonville during California's early strawberry boom. Around 1902, they planted and commercialized a distinctive berry known as the "Banner" strawberry. Driscoll's was officially founded in 1904 as Banner Berry Farm's Brand and sold the Banner strawberry variety exclusively.

35.     During World War II, much of the strawberry industry struggled after Japanese-American farmers were forced into internment camps, but Driscoll's continued operating. After the war, the company worked with Japanese-American farmers returning to agriculture. Around this time, the company began operating under the name Driscoll Strawberry Associates, Inc.

36.     In the decades that followed, Driscoll Strawberry Associates expanded its berry breeding, licensing, and distribution operations and eventually became one of the largest berry companies in the world. Today, Driscoll's markets strawberries, blueberries, raspberries, and blackberries throughout the United States and internationally through a network of licensed growers. Driscoll's represents that it exercises extensive oversight of these growers, including through audits, monitoring, and compliance programs designed to ensure adherence to its growing standards, including standards governing pest-control methods and pesticide use for berries sold under the Driscoll's brand.

37.     The company also touts that it pioneered innovations in packaging and consumer marketing, including widespread use of the plastic berry "clamshell" container now ubiquitous in grocery stores. By continuously introducing new berry varieties optimized for flavor, appearance, shelf life, and transportability, Driscoll's became the dominant branded berry supplier in the United States and ultimately the world's largest berry company.

38.     Today, Driscoll's markets berries grown in more than twenty countries and sold across dozens of international markets. Although the company publicly describes itself as working with independent growers, it retains substantial control over the underlying genetics, licensing, quality standards, branding, packaging, and commercialization of its berries. The company's modern business model is built around proprietary breeding programs, extensive

CLASS ACTION COMPLAINT

research and development operations, and tight control over the berry varieties authorized for production under the Driscoll's name.

39.    Defendant markets and sells both conventional and USDA-certified organic strawberries through distinct product lines. Organic strawberries are subject to separate federal organic certification requirements and restrictions governing pesticide usage.

40.    The testing and reporting underlying this action identified pesticide residues and PFAS-related fluorinated compounds in Driscoll's conventional Strawberries.

41.    By contrast, publicly reported testing concerning Defendant's organic strawberries showed either non-detect results or materially different residue profiles.

42.    Defendant's own distinction between its conventional and organic strawberries further demonstrates that Defendant was capable of marketing and selling Strawberries cultivated under materially different pesticide-use standards while allegedly failing to adequately disclose the nature of the pesticide compounds associated with its conventional Strawberries.

43.    Reasonable consumers purchasing Defendant's conventional Strawberries would expect Strawberries marketed as "safe," "wholesome," and produced under "rigorous food safety standards" not to contain persistent fluorinated pesticide compounds and PFAS-related residues that consumer increasingly seek to avoid.

**B.    DRISCOLL'S MARKETS ITS STRAWBERRIES AS CAREFULLY CONTROLLED, SAFE, PREMIUM STRAWBERRIES PRODUCED UNDER RIGOROUS AGRICULTURAL AND FOOD SAFETY STANDARDS**

44.    Driscoll's does not market its Strawberries as an undifferentiated commodity produce product. Instead, Driscoll's has carefully cultivated a premium brand identity centered on representations of safety, quality, wholesomeness, sustainability, and rigorous agricultural oversight.

45.    Through its packaging, website, advertising, and grower standards, Driscoll's repeatedly assures consumers that its Strawberries are grown using carefully controlled practices designed to minimize harmful inputs and promote consumer health and safety.

14

CLASS ACTION COMPLAINT

46.    Indeed, Driscoll's prominently advertises that it sells, "Only The Finest Berries," a phrase it has trademarked and displayed on bright yellow product packaging.



47.    Driscoll's further defines the "Driscoll's Difference" by representing that its berries are "hand-picked at peak ripeness to meet our strict quality standards," while assuring consumers that its Strawberries are "naturally grown" and "never genetically modified."[10]

### The Driscoll's Difference

Working with independent growers, each strawberry is hand-picked at peak ripeness to meet our strict quality standards. The secret to our strawberries is our proprietary varieties. We start with thousands of varieties and choose the top 1% to sell under the Driscoll's name. Rest assured—our naturally grown strawberries are never genetically modified.

How we grow →



---

[10]    Driscoll's,    *Strawberry    Sweetness    Worth    Sharing*, https://www.driscolls.com/Berries/Strawberries (last visited June 9, 2026).

CLASS ACTION COMPLAINT

48.     Driscoll's emphasizes to consumers that it exercises extensive oversight and scientific control over the berry growing process. On its "How We Grow" and related webpages, Driscoll's represents that "patented berry varieties are primarily developed through years of research using only natural breeding methods."[11]



---

[11] Driscoll's, *Our Practices*, https://www.driscolls.com/about/Our-Practices (last visited June 24, 2026).

CLASS ACTION COMPLAINT

49. Driscoll's similarly represents that its experts "use natural breeding methods" and that it "[n]ever irradiate[s] or genetically modif[ies]" its plants.[12]

## Growing only the finest berries in the world begins with Driscoll's commitment to research and development.

Our experts use natural breeding methods to create our patented varieties. Of course, the first thing we look for is flavor.

We rely on natural cross-pollination techniques to continually improve Driscoll's berries. We never irradiate or genetically modify our plants.

We naturally breed berry plants to be more resistant to diseases and pests while meeting our quality standards for flavor and appearance. Each year, we study thousands of potential plants to choose the top 1% to farm and sell under the Driscoll's brand name. It takes five to seven years to produce a seedling that is ready for commercial production. Every season, we flavor-test more than 500 selected varieties from our test plots around the world. Every Driscoll's berry must be flavorful, attractive, resistant to disease and hardy enough to ship well and arrive fresh at the store.

Driscoll's patented plants are available only to our independent farmers.

50. The company further represents that its nursery locations are "carefully selected" to keep soil "free of pests and diseases" and that berry cuttings are grown in "the germ-free environment of Driscoll's screen houses."



Every Driscoll's berry begins life at the nursery. Driscoll's nursery locations are carefully selected based on their geographic isolation, which keeps the soil free of pests and diseases.Cuttings are taken from an original selected seedling and grown in the germ-free environment of Driscoll's screen houses. From there, the seedlings are planted and grown in nursery fields, a process that can take several years. After the seedlings are harvested, they are carefully packed and shipped to our coolers, where they are kept chilled so that the plants remain in hibernation. Our independent farmers pick up their seedlings just in time for planting.

---

[12] Driscoll's, *How We Grow Our Berries*, https://www.driscolls.com/about/our-practices/how-we-grow (last visited June 24, 2026).

51. Driscoll's actively markets its Strawberries as uniquely superior products that stand apart from all other berries available to consumers. As Driscoll's current Chief Executive Officer Soren Bjorn has exclaimed, "[y]ou have to find a way to say this strawberry is different from that strawberry, which isn't necessarily an easy thing to do. But our strawberries actually are different—no one else grows the strawberries we grow."[13] Driscoll's marketing efforts reinforce this message, with the company emphasizing that it is "aiming to get Americans to understand what makes Driscoll's berries unique."[14]

52. Furthermore, as reported in THE NEW YORKER, Driscoll's internally positions its berries as "the produce category most associated with happiness," mapping consumer associations with its Strawberries to concepts such as "Freedom and Harmony."[15] Driscoll's president has stated that the company has "helped shape what a strawberry looks like with our relentless focus," signaling that Driscoll's exercises comprehensive control over the breeding, production, and quality of its fruit. [16]

53. Likewise, Driscoll's brand strategist Frances Dillard has explained that "[c]onsumers have to be more satisfied, or what we call more delighted, all the time," underscoring the company's commitment to delivering berries that meet heightened consumer expectations for quality, safety, and consistency.[17]

54. Driscoll's also markets its Strawberries as cultivated using environmentally responsible and sustainability focused practices designed to minimize unnecessary chemical inputs. For example, Driscoll's represents, "[b]erries aren't produced in a factory; they're grown outside in a dynamic biological environment. The farmers' challenge is to work with nature, using years of experience and know-how to get the very best out of each berry plant. The goal

[13] Stephanie Strom, *Driscoll's Aims to Hook the Berry-Buying Shopper*, INT'L N.Y. TIMES, Sept. 9, 2016, *available at* https://www.nytimes.com/2016/09/09/business/driscolls-aims-to-hook-the-berry-buying-shopper.html.

[14] *Id.*

[15] Dana Goodyear, *How Driscoll's Reinvented the Strawberry*, NEW YORKER (Aug. 14, 2017), *available at* https://www.newyorker.com/magazine/2017/08/21/how-driscolls-reinvented-the-strawberry.

[16] *Id.*

[17] *Id.*

CLASS ACTION COMPLAINT

of every Driscoll's farmer is to shape, rather than control, the biological diversity of their fields, with a minimum amount of agricultural inputs."[18]



Berries aren't produced in a factory; they're grown outside in a dynamic biological environment. The farmers' challenge is to work with nature, using years of experience and know-how to get the very best out of each berry plant. The goal of every Driscoll's farmer is to shape, rather than control, the biological diversity of their fields, with a minimum amount of agricultural inputs.

55.    Driscoll's also accentuates to consumers that all of its berries are non-GMO and that its "Research and Development Department is the industry leader in the development of premium berry plants that utilize natural and traditional breeding processes."[19]

---

[18] Driscoll's, *How We Grow*, https://www.driscolls.com/about/our-practices/how-we-grow (last visited June 24, 2026).

[19] Driscoll's, *Strawberry Sweetness Worth Sharing*, https://www.driscolls.com/Berries/Strawberries (last visited June 24, 2026).

CLASS ACTION COMPLAINT



**WHY DO STRAWBERRIES MOLD SO FAST?**

**WHERE DO DRISCOLL'S STRAWBERRIES COME FROM?**

**ARE STRAWBERRIES GMO?**

All Driscoll's berries, both conventional and organic, are non-GMO. Driscoll's Research and Development department is the industry leader in the development of premium berry plants that utilize only proven natural and traditional breeding processes.

56.    In its environmental stewardship statement, Driscoll's further represents that, "[w]e support innovations and sustainable practices that protect the long-term viability of agriculture and the berries we all love," while also explaining that its art of growing berries fosters "ideas and innovations that boost biodiversity, opportunity, and sustainability."[20]

---

[20] Driscoll's, *One Family One Earth*, https://www.driscolls.com/one-family-one-earth (last visited June 24, 2026).

CLASS ACTION COMPLAINT





57.     Driscoll's specifically represents that it employs Integrated Pest Management ("IPM") principles designed to reduce pesticide use and environmental impacts. According to Driscoll's, "IPM employs a combination of natural and synthetic means to reduce disease and pest pressures," relies upon "constant field monitoring," and includes "the use of beneficial organisms to control damaging pests." Driscoll's additionally represents that it has "made a commitment to significantly increase the production of organic berries and utilize our experience

21

CLASS ACTION COMPLAINT

in organic farming to reduce the use of synthetic materials (including pesticides) in all of our products."[21]

## Pesticides

In the United States, federal and state laws strictly regulate the use of pesticides. U.S. EPA, U.S. FDA, and state and county agencies all have regulatory authority governing the safe use of pesticides. All independent farmers around the world who grow Driscoll's berries must adhere to local and federal laws applicable to that growing region as well as country specific import and export regulations.

Driscoll's independent farmers are leaders in the practice of Integrated Pest Management (IPM). IPM employs a combination of natural and synthetic means to reduce disease and pest pressures. IPM employs constant field monitoring and also includes the use of beneficial organisms to control damaging pests. Driscoll's independent farmers are free to choose which Integrated Pest Management methods they use. Regardless of the pest control method, all pesticide use must be in compliance with federal and state laws.

Driscoll's has made a commitment to significantly increase the production of organic berries and utilize our experience in organic farming to reduce the use of synthetic materials (including pesticides) in all of our products. For additional information on specific pesticides available for use by farmers, please refer to the U.S. EPA's website.

58.     Beyond sustainability messaging, Driscoll's repeatedly assures consumers that its Strawberries are subject to rigorous food safety standards and oversight mechanisms. Driscoll's represents that its berries are "grown, harvested and shipped with the highest standards of care possible" and that its "rigorous food safety standards apply regardless of where the berries are grown." Driscoll's further states that its Global Food Safety Program was developed through "decades of research, consumer feedback and close cooperation with food safety experts as well as state, federal and international regulatory agencies."[22]

---

[21] Driscoll's, *Food Safety Standards for Berries*, https://www.driscolls.com/about/Our-Practices/Food-Safety (last visited June 24, 2026).

[22] *Id.*

## Driscoll's Global Food Safety Program

Our berries are grown, harvested and shipped with the highest standards of care possible and our rigorous food safety standards apply regardless of where the berries are grown. Driscoll's Global Food Safety Program has been developed from decades of research, consumer feedback and close cooperation with food safety experts as well as state, federal and international regulatory agencies. It is founded on the principles of Good Agriculture Practices (GAPs) established by the United States Food and Drug Administration (FDA) and reinforced through education, laboratory assays and annual third party audits.

59.     Driscoll's also represents that it actively audits and monitors compliance throughout its grower network. According to Driscoll's, independent third-party auditors verify that Good Agricultural Practices are followed "on every farm and facility around the world," including monitoring "soil, water, fertilizer use, pest control methods, harvest practices and food safety and security procedures." Driscoll's further represents that "[n]on-compliance issues are addressed and corrective measures are verified by Driscoll's," and that growers face "consequences, up to and including termination of their association with Driscoll's" for violations of company policy.[23]

60.     Driscoll's similarly markets itself as committed to providing consumers with the "freshest, safest, and most flavorful berries," while emphasizing that consumer safety and product "wholesomeness" are central priorities. Driscoll's also touts the role of its "Berry Innovators," including "agronomists, breeders, sensory analysts, plant health scientists, and entomologists," who supposedly work "with Mother Nature to develop the best berries possible using proven natural traditional breeding practices."[24]

---

[23] *Id.*

[24] Driscoll's, *Finest Berries Start Here*, https://www.driscolls.com/about/berry-innovators (last visited June 24, 2026).

CLASS ACTION COMPLAINT



Home / About / Berry Innovators

## Driscoll's Berry Innovators

Share

Strawberries that are firm, but not too crunchy. Raspberries that are sweet and juicy, but not mushy. Blackberries that are huge, beautiful, and burst in your mouth with juicy flavor. And blueberries that are flavorful, but not tart. These near perfect berries don't happen by accident. Growing perfectly fresh, beautiful, delicious berries is as much of an art as it is a science. The Berry Innovators are the artists behind those berries.

Working together as a team of agronomists, breeders, sensory analysts, plant health scientists, and entomologists, the Berry Innovators research and develop the very highest quality berries. The Berry Innovators work with Mother Nature to develop the best berries possible using proven natural traditional breeding processes such as hand cross-pollination (Driscoll's Berries are not genetically modified) and to ensure that those fresh, tasty, colorful berries make their way to berry lovers the world over.

Driscoll's is excited to share some of these techniques it uses to make its patented varieties of berries and tell you about some of the people behind the scenes who are dedicated to ensuring the top quality at every stage of the process.

61.    Driscoll's wants consumers to know the importance of investing in physical health. In fact, Driscoll's "invest[s] in local health and education programs, and safeguard vital spaces that promote the social and physical wellness of everyone."[25]

---

[25] Driscoll's, *One Family, One Earth*, https://www.driscolls.com/one-family-one-earth (last visited June 24, 2026).

CLASS ACTION COMPLAINT



62.    Finally, Driscoll's seeks to differentiate itself by representing that, "[u]nlike other companies, Driscoll's sends its berry varieties to farmers who grow plants that the Berry Innovators determine are of superior quality. That means that every Driscoll's berry comes from a fruit plant that meets Driscoll's high standards."[26]

---

[26]    Driscoll's, *How We Test for the Best*, https://www.driscolls.com/about/berry-innovators/Identifying-The-Best-Berries (last visited June 24, 2026).

CLASS ACTION COMPLAINT



How We Test for the Best

Share

Unlike other companies, Driscoll's sends its berry varieties to farmers who grow plants that the Berry Innovators determine are of superior quality. That means that every Driscoll's berry comes from a fruit plant that meets Driscoll's high standards.

63. Taken together, Driscoll's extensive marketing and public statements communicate to reasonable consumers that its Strawberries are cultivated using carefully monitored, environmentally reasonable methods designed to minimize harmful chemical exposure and ensure safe, wholesome produce. As detailed below, reasonable consumers would understand and interpret these representations to mean that Defendant's Strawberries are not associated with persistent fluorinated pesticide compounds or PFAS-related chemicals that consumers increasingly seek to avoid, particularly in fresh produce marketed to families and children.

64. Driscoll's knew or should have known that reasonable consumers are increasingly concerned about PFAS compounds, persistent pesticide residues and synthetic chemical exposure in Strawberries. Driscoll's representations above and incomplete representations were material because reasonable consumers would have considered the

presence and/or use of PFAS-related pesticide compounds important in deciding whether to purchase Defendant's Strawberries and how much to pay for them.

### C. CONSUMERS SEEK TO AVOID PFAS-RELATED COMPOUNDS AND PERSISTENT PESTICIDES

65. PFAS are a large class of synthetic chemicals which are harmful to both humans and the environment.[27] Fluorine is an atomic element present in the molecular structure of PFAS.[28]

66. PFAS are known as "forever chemicals" because their synthetic molecular structure (bonds of carbon and fluorine) is exceedingly strong, such that PFAS do not biodegrade or otherwise break down easily.[29] This is particularly problematic because PFAS are toxic and carcinogenic, are known to be dangerous, and are known to cause serious health issues to those who ingest or are otherwise exposed to them.

67. Human exposure to PFAS occurs primarily through ingestion, including contaminated food packaging, and food grown or raised in contaminated environments.[30]

68. PFAS are known to "bioaccumulate" meaning they build up in the body over time because they are slowly excreted and do not readily break down. Thus, ongoing low-level exposure results in a buildup of PFAS within the body.[31]

---

[27] *See, e.g*., United States Agency for Toxic Substances &Disease Registry ("ATSDR"), *PFAS and Your Health*, https://www.atsdr.cdc.gov/pfas/about/index.html (last visited June 24, 2026).

[28] Nat'l Inst. of Env'l Health Scis. ("NIEHS"), *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last visited June 24, 2026) ("PFAS molecules have a chain of linked carbon and fluorine atoms. Because the carbon-fluorine bond is one of the strongest, these chemicals do not degrade easily in the environment.").

[29] *Id.*

[30] Herbert P. Susmann et al., *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, 127(10) ENV'T HEALTH PERSPECTIVES 107003-1 (Oct. 2019), https://ehp.niehs.nih.gov/doi/epdf/10.1289/EHP4092.

[31] NIEHS, *PFAS*, https://www.niehs.nih.gov/health/topics/agents/pfc (last visited June 24, 2026).

CLASS ACTION COMPLAINT

69.    PFAS are associated with a wide range of adverse health outcomes.[32]

70.    For instance, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[33]

71.    The United States Environmental Protection Agency ("EPA") reports that "peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to" decreased fertility and high blood pressure in women, developmental delays for children, increased risk of certain cancers, interference with the body's natural hormones, increased cholesterol, increased risk of obesity, and reduced immune system responsiveness.[34]

72.    The following figure from the European Environmental Agency ("EEA") graphically depicts the effects of PFAS on the human body:[35]

[32]    ATSDR, TOXICOLOGICAL PROFILE FOR PERFLUOROALKYLS (May 2021), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf; Giovanni Costa et al., *Thirty Years of Medical Surveillance in Perfluorooctanoic Acid Production Workers*, 51(3) J. OCCUPATIONAL & ENV'T MED. 364 (2009), https://pubmed.ncbi.nlm.nih.gov/19225424/; EPA, Request for Comment, Solicitation of Interested Parties for Enforceable Consent Agreement Development, and Notice of Public Meeting on Perfluorinated Acid (PFOA), Fluorinated Telomers, 68 Fed. Reg. 18,626, 18,628 (Apr. 16, 2003); Press Release, EPA, *EPA and 3M Announce Phase Out of PFOS* (May 16, 2000), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/ 33aa946e6cb11f35852568e100 5246b4.html; Nuria Matilla-Santander et al., *Exposure to Perfluoroalkyl Substances and Metabolic Outcomes in Pregnant Women: Evidence from the Spanish INMA Birth Cohorts*, 125(11) ENV'T HEALTH PERSPECTIVES 117004-1 (2017), https://ehp.niehs.nih.gov/doi/epdf/10.1289/EHP1062; Yu Zhu et al., *Associations of Serum Perfluoroalkyl Acid Levels with T-Helper Cell-Specific Cytokines in Children: By Gender and Asthma Status*, 559 SCI. TOTAL ENV'T 166 (2016), https://doi.org/10.1016/j.scitotenv.2016.03.187; Vaughn Barry et al., *Perfluorooctanoic Acid (PFOA) Exposures and Incident Cancers Among Adults Living Near a Chemical Plant*, 121(11-12) ENVT'L HEALTH PERSP. 1313 (2013), https://ehp.niehs.nih.gov/doi/10.1289/ehp.1306615; Ann Vuong et al., *Prenatal Polybrominated Diphenyl Ether and Perfluoroalkyl Substance Exposures and Executive Function in School Age Children,* 147 ENV'T RES. 556 (2016), https://doi.org/10.1016/j.envres.2016.01.008; Stephanie J. Frisbee et al., *Perfluorooctanoic Acid, Perfluorooctanesulfonate, and Serum Lipids in Children and Adolescents: Results from the C8 Health Project*, 164(9) ARCHIVES PEDIATRICS & ADOLESCENT MED. 860 (2010), https://doi.org/10.1001/archpediatrics.2010.163.

[33] *Id.*

[34] EPA, *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited June 24, 2026).

[35] European Env'l Agency, *Emerging Chemical Risks in Europe—'PFAS'* (Dec. 16, 2019), *available at* https://www.eea.europa.eu/en/analysis/publications/emerging-chemical-risks-in-europe.



**Figure 1. Effects of PFAS on human health**

Sources: US National Toxicology Program, (2016); C8 Health Project Reports, (2012); WHO IARC, (2017); Barry et al., (2013); Fenton et al., (2009); and White et al., (2011).

73.    Research conducted by the Harvard T.H. Chan School of Public Health in 2012 establishes that children with higher PFAS exposure had worse responses to standard childhood vaccines and that "when PFA exposure was doubled, children would lose 50% of the antibodies they should have had from their vaccinations."[36] This research also established that "children with higher levels of PFAS when they were born . . . had lower antibody levels in response to later vaccinations."[37]

---

[36] Staff Writer, *Stricter federal guidelines on 'forever chemicals' in drinking water pose challenges*, HARVARD T.H. CHAN SCH. PUB. HEALTH (June 22, 2022), https://hsph.harvard.edu/news/stricter-federal-guidelines-on-forever-chemicals-in-drinking-water-pose-challenges/.

[37] *Id.*

29

CLASS ACTION COMPLAINT

74.     Research conducted by the National Cancer Institute's Division of Cancer Epidemiology & Genetics has also shown that PFAS "measured in women during pregnancy were associated with risk of childhood acute lymphoblastic leukemia in their offspring."[38] The research found that "[b]ecause PFOS and PFOA can suppress antibody responses, it is plausible for some PFAS to be risk factors for childhood leukemia."[39]

75.     The EPA has advised, "[b]ecause certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[40]

76.     Notably, there is currently no medical treatment capable of removing PFAS from the human body. Given that PFAS accumulate in body tissue over time, the most effective means of reducing PFAS exposure is to avoid contact with or ingestion of PFAS.[41]

77.     "No level of PFAS in the body is considered safe, and [PFAS chemicals] have been linked to a litany of health problems, including cancers[,]"[42] including certain "digestive, endocrine, respiratory, and mouth and throat cancers."[43]

---

[38] Jennifer K. Loukissas, *Childhood Leukemia Linked to PFAS Levels Measured in Mother's First Trimester*, NAT'L CANCER INST. (Dec. 13, 2023), https://dceg.cancer.gov/news-events/news/2023/pfas-childhood-leukemia.

[39] *Id.*

[40] EPA, *Meaningful and Achievable Steps You Can Take to Reduce Your Risk*, at https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (last updated Apr. 21, 2026).

[41] George Citroner, *How to Avoid 'Forever' Chemicals in Your Dinner (and Microwave Popcorn)*, HEALTHLINE (Oct. 10, 2019), https://www.healthline.com/health-news/how-to-avoid-the-forever-chemicals-in-your-dinner-and-popcorn#So-how-can-you-avoid-PFAS.

[42] Jenny Blair, *Forever Chemicals Promote Cancer Cell Migration*, YALE SCH. PUB. HEALTH (Dec. 11, 2023), https://ysph.yale.edu/news-article/yale-study-forever-chemicals-promote-cancer-cell-migration/.

[43] Press Release, Zara Abrams, *Study links PFAS contamination of drinking water to a range of rare cancers* (Jan. 14, 2025), https://keck.usc.edu/news/study-links-pfas-contamination-of-drinking-water-to-a-range-of-rare-cancers/; *see also* Nat'l Cancer Inst., *PFAS Exposure and Risk of Cancer*, https://dceg.cancer.gov/research/what-we-study/pfas (considering some PFAS possible and human carcinogens (last visited June 24, 2026).

78.     Exposure to PFAS has also been scientifically linked to "reproductive harm, immune system damage," and influence on the nervous system and brain development.[44]

79.     Exposure to PFAS has been shown to be associated with a wide range of additional adverse health effects or risks of such effects, including:

   a.     Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women;

   b.     Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes;

   c.     Increased risk of some cancers, including prostate, kidney, and testicular cancers;

   d.     Reduced ability of the body's immune system to fight infections, including reduced vaccine response;

   e.     Interference with the body's natural hormones; and

   f.     Increased cholesterol levels and/or risk of obesity.[45]

80.     Moreover, a recent study conducted by the Yale School of Public Health revealed that exposure to PFAS increases the ability of colorectal carcinoma cells to move, or spread, throughout the body.[46] The study's researchers observed that "increased cell motility" and "found metabolic changes that were consistent with cancer metastasis."[47]

---

[44] U.N. Environment Programme, *Per- and Polyfluoroalkyl Substances (PFASs)*, https://www.unep.org/topics/chemicals-and-pollution-action/pollution-and-health/persistent-organic-pollutants-pops/and (last updated Feb. 13, 2024).

[45] EPA, *supra* n.33.

[46] Blair, *supra* n.41.

[47] *Id*.

31

CLASS ACTION COMPLAINT

81. Additionally, PFAS exposure could be linked to thyroid disease and increased cholesterol levels and liver disease.[48] PFAS may delay mammary gland development and lower birth weight in unborn children.[49]

82. PFAS can also be transmitted from the mother to the child across the placenta before a child has been born as well as through breast milk.[50] This may result in babies with ten times more PFAS in their blood than their mothers.[51]

83. Children with higher PFAS exposure can have "a poorer response to routine childhood vaccinations[.]"[52] For example, "when PFAS exposure was double, children would lose 50% of the antibodies they should have had from their vaccinations[.]"[53]

**D. INDEPENDENT TESTING DETECTED PFAS-RELATED PESTICIDE COMPOUNDS**

84. In or around May 2026, public reporting (the "Mamavation Report") discussed independent laboratory testing identifying multiple pesticide residues on Driscoll's Strawberries, including fluorinated pesticide compounds and/or compounds associated with PFAS chemistry.[54]

85. In particular, the independent testing found that Driscoll's Strawberries contained residues of 12 different pesticides, eight of which are considered PFAS "forever chemicals," meaning they are extremely persistent and highly toxic. These pesticides are also known as "forever pesticides."

---

[48] Suzanne E. Fenton et al., *Per- and Polyfluoroalkyl Substance Toxicity and Human Health Review: Current State of Knowledge and Strategies for Informing Future Research*, ENV'T TOXICOLOGY & CHEMISTRY 606 (Oct. 5, 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7906952/.

[49] *Id.*

[50] Staff Writer, *supra* n.35.

[51] *Id.*

[52] *Id.* ("children with higher levels of PFAS when they were born . . . had lower antibody levels in response to later vaccinations.").

[53] *Id.*

[54] Leah Segedie, *Mamavation Finds PFAS-Laden Pesticides in Driscoll's Strawberries*, MAMAVATION (May 12, 2026), https://mamavation.com/food/pfas-pesticides-driscolls-strawberries.html.

32

CLASS ACTION COMPLAINT

86.    The following is a list of the PFAS-Laden Pesticides (a.k.a "Forever Pesticides") found on Driscoll's Strawberries:

    a.    Flonicamid (sum) 32 ppb

    b.    Fludioxonil 60 ppb

    c.    Flupyradifurone 27 ppb

    d.    Fluxapyroxad 26 ppb (limit also exceeds Russian standards)

    e.    Indoxacarb 25 ppb (limits also exceed European Union, Taiwan & Chile standards)

    f.    Novaluron 19 ppb (limits also exceed European Standards)

    g.    Tetraconazole 13 ppb

    h.    TFNG 35 ppb

87.    Other types of pesticides found on Driscoll's conventional Strawberries, include:

    a.    Cyprodinil 125 ppb

    b.    Pyrimethanil 310 ppb

    c.    Quinoxyfen 45 ppb (limit also exceeds Korean standards)

    d.    Tetrahydrophthalimide (THPI) 302 ppb

88.    The Mamavation Report has generated significant consumer concern in news outlines and on social media regarding the nature of the pesticide residues allegedly present on Driscoll's Strawberries.

89.    On May 18, 2026, Moms Across America, a "national nonprofit coalition of mothers and others dedicated to empowering millions to educate themselves about the health impacts of GMOs, pesticides, and toxins in [the] food supply,"[55] posted on social media that [c]hildren living near Driscoll's strawberry fields are facing a 38% higher childhood cancer rate than average."[56] Further, "[r]esearchers identified 13 pesticides linked to childhood cancer being

---

[55] Moms Across America, *FAQs*, https://www.momsacrossamerica.com/faq (last visited June 24, 2026).

[56] Moms Across America (@momsacrossamerica), Instagram (May 18, 2026), https://www.instagram.com/p/DYe3uBSlfFN/.

CLASS ACTION COMPLAINT

sprayed within 2.5 miles of homes and 98.5% of the leukemia-linked pesticides studied were applied in Watsonville, California, where Driscoll's main strawberry operations are located."[57]



90.    Despites its extensive marketing regarding safety, wholesomeness, and rigorous standards as illustrated above, Driscoll's failed to adequately disclose to consumers the alleged presence and/or use of persistent fluorinated pesticide compounds associated with PFAS chemistry.

91.    Driscoll's knew or should have known that reasonable consumers would consider such information material.

92.    Driscoll's possessed superior knowledge concerning its agricultural practices, supplier standards, pesticide protocols, and residue testing.

93.    Nowhere on the clamshell plastic box that Defendant champions as innovation in packaging and marketing does Driscoll's disclose that its Strawberries contain PFAS or that Driscoll's uses, and allows licensees to use, PFAS-laden pesticides to produce its Strawberries. To the contrary, Defendant only states its trademarked phase "Only the Finest Berries."

---

[57] *Id.*

**E.    INTERNATIONAL REGULATORY STANDARDS AND FOREIGN RESIDUE LIMITS FURTHER DEMONSTRATE THE MATERIALITY OF THE ALLEGED PFAS-RELATED RESIDUES**

94.    The independent testing and reporting underlying this action identified pesticide residue levels in Defendant's Strawberries that exceeded regulatory limits or standards established in multiple foreign jurisdictions.

95.    The existence of stricter standards and lower allowable limits in numerous foreign countries is relevant to materiality, consumer expectations, and Defendant's knowledge concerning the nature of the alleged residues, especially considering Defendant must concede it is a global company, working with 900 berry growers in 20 countries worldwide.

96.    Multiple countries and international regulators have adopted more precautionary approaches to PFAS-related compounds, fluorinated pesticides, and persistent chemical residues in strawberries because of concerns regarding environmental persistence, bioaccumulation, and potential long-term human exposure.

97.    The fact that alleged residue levels may exceed limits deemed acceptable in other developed nations supports the reasonableness of consumer concerns regarding the presence of such compounds in Strawberries marketed as "safe," "wholesome," and subject to "rigorous food safety standards."

98.    Reasonable consumers are increasingly aware that regulatory standards concerning PFAS compounds and persistent fluorinated chemicals continue to evolve worldwide and that certain jurisdictions have developed more protective standards than those currently in place in the United States.

99.    The foreign standards and limits are not alleged herein as independent legal duties governing Defendant's conduct in the United States. Rather, they are relevant evidence of:

a.    The growing scientific and regulatory concern surrounding PFAS-related compounds;

b.    The materiality of such compounds to reasonable consumers;

c.    The feasibility of stricter residue limitations and alternative agricultural practices; and

35

CLASS ACTION COMPLAINT

       d.     The misleading nature of Defendant's representations and misleading partial disclosures regarding wholesomeness, sustainability, and pesticide practices.

100. The existence of stricter international standards further demonstrates that reasonable consumers could attach significant importance to information concerning PFAS-related pesticide compounds and persistent fluorinated residues when making purchasing decisions.

**F.   DEFENDANT'S GREENWASHING CLAIMS ARE DECEPTIVE AND VIOLATE THE GREEN GUIDES**

101. Driscoll's has repeatedly represented to consumers that it is committed to environmental sustainability, responsible resource management, and agricultural practices designed to protect natural ecosystems. Through its sustainability initiatives, marketing materials, and corporate communications, Driscoll's portrays itself as a company that operates in harmony with the environment and prioritizes long-term ecological health.

102. Driscoll's publicly states that, "Driscoll's defines Sustainability as 'meeting our present needs without compromising the ability of future generations to meet their needs.' [Driscoll's] see[s] economic performance as inseparable from social and environmental performance." [58]

---

[58] Driscoll's, *Sustainability*, https://www.driscolls.com/about/Sustainability (last visited June 24, 2026).

CLASS ACTION COMPLAINT

## Thriving in the Present, Providing for the Future

As a multi-generational, family-owned company, Driscoll's defines Sustainability as "meeting our present needs without compromising the ability of future generations to meet their needs." We see economic performance as inseparable from social and environmental performance. This concept is commonly referred to as the Triple Bottom Line. We recognize that the achievement of true sustainability, or a healthy triple bottom line, is a journey and one in which we do not have all the answers, but we have fully committed resources and committed company leadership ensuring that we make continual progress toward waste reduction and better care for the natural and social resources on which we depend.

We believe we have a responsibility—and an opportunity—to be leaders in the agricultural industry. We work closely with our farmers, supply chain partners and the communities in which we operate to address the environmental risks to our business and our local communities. Our collaborative approach allows us to have a greater impact beyond berry production and take advantage of external expertise and capabilities.

103.   In addition, among other things, Driscoll's publicly states that it seeks to create "a future where resources are managed responsibly" and emphasizes that it works "with the land, not against it." Driscoll' further represents that it supports "innovations and sustainable practices" intended to protect the long-term viability of agriculture and natural resources. These representations and misleading partial disclosures communicate to reasonable consumers that Driscoll's berry production practices are environmentally responsible and designed to minimize harmful environmental impacts.

104.   Driscoll's also prominently markets its sustainability efforts through initiatives focused on water conservation, water quality improvement, biodiversity, soil health, and regenerative agricultural practices. The company identifies water conservation and water-quality protection as core sustainability priorities and represents that it works collaboratively with growers and communities to drive sustainability change. Through these statements, Driscoll's conveys that its agricultural operations are conducted in a manner that protects natural resources and promotes environmental stewardship.[59]

---

[59] *Id.*

**Water: Our Most Precious Resource**

After identifying our greatest risks and the opportunities, we established water conservation and improving water quality as our first sustainability priority. Water is a critical resource for residents and industry, particularly for agriculture, yet many places face critical water quality and supply issues. Driscoll's has taken great strides to address these issues and drive sustainable change by working collaboratively with our independent farmers and the community.



**Water Conservation and Quality**

Driscoll's partners with our independent farmers, government agencies and the University of California to address water shortage

Learn More →

105.    Reasonable consumers are increasingly concerned about the environmental consequences of agricultural production, including contamination of soil and water resources through the use of persistent synthetic chemicals. As a result, Driscoll's environmental stewardship and sustainability representations and misleading partial disclosures are material to consumers' purchasing decisions and contribute to the premium reputation and value associated with the Driscoll's brand.

CLASS ACTION COMPLAINT

106.    A survey conducted by NIQ found that 77% of respondents would stop purchasing a brand if it was found guilty of greenwashing.[60]



107.    Importantly, these representations and misleading partial disclosures are in response to more consumers wanting to buy environmentally friendly products and companies touting the environmental benefits of their products.

108.    The Federal Trade Commission ("FTC") released its initial "Guides for the Use of Environmental Marketing Claims" ("Green Guides")[61] that "set forth the [FTC's] current views about environmental claims" and provide guidance to marketers to "avoid making environmental claims that are unfair or deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45."[62]

---

[60] NIQ, *How to Turn Green Consumer Intentions into Sustainable Actions* (Sept. 26, 2023), *available at* https://nielseniq.com/global/en/insights/report/2023/how-to-turn-green-consumer-intentions-into-sustainable-actions/ (last visited June 24, 2026).

[61] 16 C.F.R. § 260 (2026) (Guides for the Use of Environmental Marketing Claims ("Green Guides").

[62] 16 C.F.R. § 260.1 (2026).

CLASS ACTION COMPLAINT

109. The Green Guides carry substantial weight in state consumer protection law: at least twelve states have laws that directly incorporate the Green Guides as the legal standard for environmental marketing claims, and twenty-seven states and territories treat the FTC's interpretation as persuasive authority.[63] States such as Illinois, Massachusetts, New Jersey and New York heavily rely on this framework, either by formally referencing general FTC standards as their local regulatory baseline or by integrating the Guides as persuasive guidelines to govern how state courts interpret environmental advertising fraud.

110. The Green Guides, together with the consumer protection statutes of Illinois, Massachusetts, New Jersey and New York, apply to Defendant's environmental representations.

111. The Green Guides "apply to claims about the environmental attributes of a product, package, or service in connection with the marketing, offering for sale, or sale of such item or service to individuals. These guides also apply to business-to-business transactions. The guides apply to environmental claims in labeling, advertising, promotional materials, and all other forms of marketing in any medium, whether asserted directly or by implication, through words, symbols, logos, depictions, product brand names, or any other means."[64]

112. The Green Guides include "general principles, specific guidance on the use of particular environmental claims, and examples . . . [that] provide the [FTC's] views on how reasonable consumers likely interpret certain claims."[65] The FTC bases such views on consumer perception research it has conducted.[66]

113. "Section 5 of the FTC Act prohibits deceptive acts and practices in or affecting commerce. A representation, omission, or practice is deceptive if it is likely to mislead

---

[63] Attorney General of California, Connecticut, Delaware, the District of Columbia, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, and Wisconsin, Comment Letter on the FTC's Decennial Regulatory Review of the *Green Guides*, Matter No. P954501, at p. 3-4 (Apr. 24, 2023) https://downloads.regulations.gov/FTC-2022-0077-0987/attachment_2.pdf.

[64] 16 C.F.R. § 260.1(c).

[65] 16 C.F.R. § 260.1(d).

[66] FTC, The Green Guides Statement of Basis and Purpose, at 3, https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf.

consumers acting reasonably under the circumstances and is material to consumers' decisions."[67] "Whether a particular claim is deceptive will depend on the net impression of the advertisement, label, or other promotional material at issue."[68]

114.    "To determine if an advertisement is deceptive, marketers must identify all express and implied claims that the advertisement reasonably conveys. Marketers must ensure that all reasonable interpretations of their claims are truthful, not misleading, and supported by a reasonable basis before they make the claims."[69]

115.    "[A] reasonable basis often requires competent and reliable scientific evidence [such as] tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results."[70]

116.    With respect to general environmental benefit claims, the Green Guides state "[i]t is deceptive to misrepresent, directly or by implication, that a product, package, or service offers a general environmental benefit."[71]

117.    However, the Green Guides address a "general environmental claim, [] focus[ing] on the net impression of an advertisement."[72] The FTC states:

a. It is deceptive to misrepresent, directly or by implication, that a product, package, or service offers a general environmental benefit.

b. Unqualified general environmental benefit claims are difficult to interpret and likely convey a wide range of meanings. In many cases, such claims likely convey that the product, package, or service has specific and far-reaching environmental benefits and may convey that the item or service has no

---

[67] 16 C.F.R. § 260.2.

[68] 16 C.F.R. § 260.1(d) (emphasis added).

[69] 16 C.F.R. § 260.2.

[70] *Id.*

[71] 16 C.F.R. § 260.4(a).

[72] FTC, *supra* n.67, at 54 (internal citations omitted); *see also* 16 C.F.R. § 260.4 (regarding general environmental benefit claims).

negative environmental impact. Because it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims, marketers should not make unqualified general environmental benefit claims.

c. Marketers can qualify general environmental benefit claims to prevent deception about the nature of the environmental benefit being asserted. To avoid deception, marketers should use clear and prominent qualifying language that limits the claim to a specific benefit or benefits. Marketers should not imply that any specific benefit is significant if it is, in fact, negligible. If a qualified general claim conveys that a product is more environmentally beneficial overall because of the particular touted benefit(s), marketers should analyze trade-offs resulting from the benefit(s) to determine if they can substantiate this claim.

d. Even if a marketer explains, and has substantiation for, the product's specific environmental attributes, this explanation will not adequately qualify a general environmental benefit claim if the advertisement otherwise implies deceptive claims. Therefore, marketers should ensure that the advertisement's context does not imply deceptive environmental claims.[73]

118.    The Green Guides provide an example: A marketer's advertisement features a picture of a laser printer in a bird's nest balancing on a tree branch, surrounded by a dense forest. In green type, the marketer states, "Buy our printer. Make a change." Although the advertisement does not expressly claim that the product has environmental benefits, the featured images, in combination with the text, likely convey that the product has far-reaching environmental benefits and may convey that the product has no negative environmental impact. Because it is highly unlikely that the marketer can substantiate these claims, this advertisement is deceptive.[74]

119.    Because the net impression of Defendant's environmental marketing claims is likely to mislead reasonable consumers, they are deceptive, especially because "[e]ven if a

---

[73] 16 C.F.R. § 260.4(a)-(d).

[74] 16 C.F.R. § 260.4, Example 3.

marketer explains, and has substantiation for, the product's specific environmental attributes, this explanation will not adequately qualify a general environmental benefit claim if the advertisement otherwise implies deceptive claims."[75]

120. The environmental marketing claims are material to the purchasing decisions of reasonable consumers. Because these representations convey explicit and implicit deceptive claims, they violate Section 5 of the FTC Act as well as the consumer protection statutes of Illinois, Massachusetts, New Jersey, and New York. [76]

121. Here, Driscoll's makes environmental marketing claims regarding the environmental features of the Strawberries and the methods to grow the Strawberries, but the marketing otherwise implies deceptive claims due to the undisclosed presence or risk of PFAS.

122. Defendant knew or reasonably should have known that its misrepresentations, misleading partial disclosures, and omissions were untrue and misleading.

123. Defendant does not ensure that all reasonable interpretations of its claims are truthful, not misleading or deceptive to reasonable consumers.

124. "Greenwashing is the act of making false or misleading statements about the environmental benefits of a product or practice."[77] Companies like Defendant rely on greenwashing because "going green sells[,]" with "85 percent of global consumers [saying] they considered the environment more when shopping than they did just five years prior[.]"[78]

125. Defendant's reliance on and use of greenwashing deceived and misled reasonable consumers into believing it was committed to benefiting the environment.

126. Defendant's statements and claims neither conform to the guidance nor are consistent with the examples provided in the Green Guides.

---

[75] 16 C.F.R. § 260.4(d).

[76] *See* 15 U.S.C. § 45(a)(1) (prohibiting unfair or deceptive acts or practices); *see also* 815 Ill. Comp. Stat. 505/2; Mass. Gen. Laws ch. 93A, § 2; N.J. Stat. Ann. § 56:8-2; N.Y. Gen. Bus. Law § 349. For the federal standard establishing that explicit or implicit environmental claims are material if they are likely to mislead a reasonable consumer, *see generally* 16 C.F.R. § 260.2 (FTC Green Guides); FTC Policy Statement on Deception, 103 F.T.C. 174 (1983).

[77] Courtney Lindwall, *What is Greenwashing*?, NAT'L RES. DEF. COUNCIL (Feb. 9, 2023), https://www.nrdc.org/stories/what-greenwashing.

[78] *Id*.

127.   The Green Guides apply to Defendant's representations and misleading partial disclosures to consumers as a business committed to sustainability and to reducing the environmental impact of its business practices and products.

128.   Defendant relies on misleading and deceptive greenwashing to market and sell the Strawberries to consumers, including those who are environmentally conscious.

129.   Defendant has even marketed itself impressing Mother Nature with its progress towards meeting environmental goals and making promises for continued progress to Mother Nature.

130.   Defendant knows its environmental efforts are important to its customers.

G.   **DRISCOLL'S EXERCISES EXTENSIVE CONTROL OVER STRAWBERRIES SOLD UNDER ITS BRAND AND CANNOT AVOID LIABILITY THROUGH ITS USE OF "INDEPENDENT" GROWERS**

131.   Driscoll's cannot avoid liability by characterizing the farms, growers, harvesters, or agricultural operations involved in producing its Strawberries as "independent" entities.

132.   Driscoll's senior vice-president and general counsel compared the company to its neighbor in Silicon Valley, explaining that "Growers are sort of like our manufacturing plants, [] we made the inventions, they assemble it, and then we market it, so it's not that dissimilar from Apple using someone else to do the manufacturing but they've made the invention and marketed the end product." [79]

133.   Driscoll's markets the Strawberries under the Driscoll's brand name and holds itself out to consumers as responsible for the quality, safety, consistency, and standards associated with its Strawberries.

134.   Driscoll's exercises substantial control over the cultivation, sourcing, quality assurance, packaging, marketing, and distribution of Strawberries sold under the Driscoll's brand.

---

[79] Dana Goodyear, *How Driscoll's Reinvented the Strawberry*, NEW YORKER, Aug. 14, 2017, *available at* https://www.newyorker.com/magazine/2017/08/21/how-driscolls-reinvented-the-strawberry.

CLASS ACTION COMPLAINT

135. Driscoll's publicly represents that it works closely with growers and implements company-wide standards governing food safety, agricultural practices, pest management and sustainability initiatives.

136. Driscoll's further represents that it conducts extensive audits, monitoring, and oversight of growing practices associated with berries sold under its brand, including oversight relating to pest control methods and pesticide practices.

137. Driscoll's also develops proprietary berry varieties, establishes growing specifications, and controls the standards that growers must satisfy in order to sell Strawberries under the Driscoll's name.

138. Consumers purchase Strawberries bearing the Driscoll's label because they rely upon the reputation, marketing, quality assurance, and representations made by Driscoll's itself, not because consumers know or rely upon any individual grower, farm laborer, picker, or independent farming operation.

139. Driscoll's liability arises from its own representations, misleading partial disclosures, omissions, branding, marketing, quality assurances, and control over Strawberries sold under the Driscoll's brand.

140. Driscoll's possessed superior knowledge regarding the agricultural practices, pesticide protocols, supplier standards, residue testing, and sourcing practices associated Strawberries sold under its brand.

141. These allegations are further supported by the Whistleblower, who had direct knowledge of Driscoll's food safety, pesticide oversight, and supplier compliance practices. According to the Whistleblower, he received communications from members of Driscoll's senior leadership reflecting that Driscoll's possessed internal information concerning pesticide-related compliance issues involving growers supplying produce under the Driscoll's brand. The Whistleblower further alleges that members of Driscoll's executive leadership questioned whether Driscoll's possessed "plausible deniability" concerning those issues despite internal documents evidencing ongoing pesticide-related concerns.

CLASS ACTION COMPLAINT

142.  According to the Whistleblower, Driscoll's leadership appeared principally concerned with protecting the company's reputation and commercial interests rather than addressing the implications of those issues for consumers or ensuring that Driscoll's public representations concerning food safety, quality assurance, and grower oversight accurately reflected the company's internal knowledge. The Whistleblower further alleges that internal meetings included discussions regarding pesticide-related compliance concerns involving a substantial number of California growers supplying produce for the Driscoll's brand.

143.  The Whistleblower further alleges that, on or about June 12, 2023, Driscoll's personnel prepared or circulated a presentation identifying pesticide-related compliance concerns involving multiple growers supplying produce sold under the Driscoll's brand and discussing the resulting risks to Driscoll's, including reputational harm. According to the Whistleblower, these discussions demonstrated that Driscoll's exercised centralized oversight of grower practices and possessed information materially different from the impression conveyed by its public marketing and representations.

144.  The Whistleblower further alleges that, on or about April 1, 2025, he was informed that Driscoll's Food Safety Group no longer conducted internal audits of growers supplying produce for the Driscoll's brand. According to the Whistleblower, he also reviewed internal correspondence reflecting efforts to attribute responsibility for pesticide-related and food safety issues to individual growers despite Driscoll's centralized oversight of supplier standards and compliance.

145.  According to the Whistleblower, after refusing to participate in conduct that he believed would conceal or minimize pesticide-related compliance concerns, he was subjected to disciplinary action culminating in the termination of his employment.

146.  Driscoll's was in a position to require disclosures, modify supplier requirements, implement different pesticide standards, conduct additional testing, or alter its marketing and labeling practices.

147.  Driscoll's profited directly from the sale of Strawberries marketed under the Driscoll's brand and derived substantial economic benefit from consumer reliance on its

representations and misleading partial disclosures concerning safety, wholesomeness, sustainability, and food quality.

148. Accordingly, Driscoll's is responsible for the misleading and deceptive representations, misleading partial disclosures, and omissions alleged herein regardless of whether certain farming, harvesting, or growing activities were performed by nominally independent growers or suppliers.

**H.  DUE TO THE PRESENCE AND MATERIAL RISK OF PFAS IN THE STRAWBERRIES, DRISCOLL'S MARKETING WAS MATERIALLY MISLEADING**

149. At all times relevant to the allegations pled in this complaint, Defendant knew or should have known that the Strawberries contained undisclosed PFAS and/or PFAS-related compounds.

150. Defendant knew or should have known that PFAS pose risks to human health and the environment.

151. Defendant knew or should have known that it owed consumers a duty of care to adequately monitor and test the Strawberries for PFAS and/or PFAS-related compounds, and to prevent or, at the very least, minimize the presence of PFAS and/or PFAS-related compounds in the Strawberries to an undetectable level.

152. A company like Driscoll's that markets its products with both personal health benefits and environmental features must not knowingly fail to ensure the safety of its products or allow unsuspecting consumers to unwittingly be exposed to dangerous toxins or contaminants, such as PFAS.

153. Rather, Driscoll's has a duty to disclose material information such as the presence or risk of PFAS in the Strawberries, which would allow consumers to make informed decisions for themselves and their families about the risks they are willing to take and assess the true value of the Strawberries they are considering purchasing. Driscoll's failed to disclose that information to Plaintiffs Class members.

154. Despite the known risks of exposure to PFAS, Defendant intentionally, negligently, recklessly, and/or knowingly sold the Strawberries without disclosing to consumers,

47

CLASS ACTION COMPLAINT

like Plaintiffs and the proposed Class members, the presence or material risk of PFAS in the Strawberries.

155.    Defendant knew consumers purchased the Strawberries based on the reasonable expectation that it grew and manufactured the Strawberries to the highest personal health and environmental standards. Based on consumers' expectation that Defendant grew and manufactured the Strawberries to the highest standards, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Strawberries to the highest standards for preventing the inclusion of PFAS in the Strawberries, which would include adequately monitoring and testing the Strawberries for PFAS.

156.    Defendant knew that testing and monitoring for PFAS in the Strawberries and responsibly growing and manufacturing the Strawberries to prevent or minimize the presence of chemicals such as PFAS was not only important, but critical to its consumers to protect their health and the environment.

157.    Further, Defendant knew or should have known it could control the levels of PFAS in the Strawberries by properly growing the Strawberries without utilizing PFAS-related pesticides.

158.    Based on the foregoing, reasonable consumers, like Plaintiffs, would consider the presence (or material risk) of PFAS a material fact when considering purchasing Strawberries.

159.    Based on the overall impression given by Defendant's representations, misleading partial disclosures, and omissions, no reasonable consumer could expect or understand that the Strawberries contained (or had a material risk of containing) PFAS.

160.    The misrepresentations, misleading partial disclosures, and omissions wrongfully convey to consumers that the Strawberries have certain quality and characteristics that they do not actually possess, including that the Strawberries do not contain PFAS.

161.    Based on the misleading partial disclosures and omissions, a reasonable consumer would not expect the presence of PFAS, nor would a reasonable consumer be able to detect the presence of PFAS in the Strawberries without conducting his or her own scientific tests (which are time-consuming and expensive) or reviewing third-party scientific testing.

162. Reasonable consumers must and do rely on Defendant to honestly report what the Strawberries contain.

163. Defendant intended Plaintiffs to, and Plaintiffs did, rely on the Strawberries' marketing, packaging, and omissions when making her purchasing decision.

164. Plaintiffs' expectations of the Strawberries and reliance on Defendant's marketing and packaging are consistent with reasonable consumers.

165. Defendant acted knowingly, negligently, recklessly, and/or intentionally with its deceptive, unfair, and misleading marketing and packaging based on the material misrepresentations, misleading partial disclosures, and omissions.

166. Additionally, Defendant knew that reasonable consumers would be ingesting and eating the Strawberries, increasing the consumer's risk to PFAS.

167. The misrepresentations, misleading partial disclosures, and omissions are material and likely to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions. This is true especially considering the long-standing campaign by Defendant to market the Strawberries with personal health benefits and environmental features, and to induce consumers, such as Plaintiffs, to purchase the Strawberries.

168. The misrepresentations, misleading partial disclosures, and omissions make the Strawberries' marketing deceptive, misleading, and unfair, due to Defendant's failure to disclose the true nature and quality of the Strawberries based on the presence or material risk of PFAS.

169. Defendant knew or should have known the Strawberries were not consistent with its marketing and packaging because of the presence or risk of PFAS.

170. Defendant knew or should have known consumers paid premium prices for the Strawberries because of its misrepresentations, misleading partial disclosures, and omissions.

171. The misrepresentations, misleading partial disclosures, and omissions were intended to and did, in fact, cause consumers like Plaintiffs and Class members to purchase the Strawberries they would not have if the true quality and nature of the Strawberries were disclosed or for which they would not have paid a premium price.

**I.    PLAINTIFFS' RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT AND DEFENDANT CAUSED ECONOMIC INJURY**

172.    The representations, misleading partial disclosures, and omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for the Strawberries that did not disclose material information as to the Strawberries' true nature, quality, and value. Defendant continues to wrongfully induce consumers to purchase the Strawberries without disclosing the presence or risk of PFAS in the Strawberries.

173.    Plaintiffs read and relied upon the marketing and packaging of the Strawberries when making her purchasing decisions. Had she known Defendant misrepresented and failed to disclose the Strawberries contained (or had a material risk of containing) PFAS, she would not have purchased the Strawberries or paid a premium price.

174.    A reasonable consumer would consider the marketing and packaging of a product when deciding whether to purchase. Moreover, as demonstrated by the consumer surveys set forth herein, a reasonable consumer would view as material representations that a product is "safe," 'wholesome," and produced under "rigorous food safety standards" not to contain persistent fluorinated pesticide compounds and PFAS-related residues that consumer increasingly seek to avoid.

175.    Defendant intended that the marketing, and packaging would be considered by the end purchasers of the Strawberries, including Plaintiffs, and the proposed Class members.

176.    Defendant directly targeted Plaintiffs and the proposed Classes through its marketing and packaging.

**V.    APPLICABILITY OF EQUITABLE TOLLING AND THE DISCOVERY RULE TO THE STATUTE OF LIMITATIONS**

177.    The applicable statutes of limitations are tolled for all of Plaintiffs' claims due to Defendant's fraudulent concealment that the Strawberries contained (or had a material risk of containing) PFAS. Defendant intentionally concealed these material facts from Plaintiffs.

178.    Defendant knew the misrepresentations, misleading partial disclosures, and omissions were a material consideration for any consumer buying the Strawberries.

179.   Defendant violated the relevant state consumer fraud acts by deceiving customers as to the true quality, characteristics, and nature of the Strawberries.

180.   Based on Defendant misrepresenting and concealing material facts from Plaintiffs, Plaintiffs could not reasonably discover that the Strawberries contained (or had a material risk of containing) PFAS.

181.   Plaintiffs were unaware that the Strawberries contained, or were produced using pesticides associated with, PFAS-related compounds. Instead, Defendant affirmatively promoted the Strawberries as being subject to rigorous food safety, quality assurance, and sustainability practices, while omitting material information concerning the presence and/or use of persistent fluorinated compounds associated with so-called "forever chemicals."

182.   Plaintiffs and the Class members' causes of action accrued during the Spring of 2026. This is the earliest Plaintiffs and other Class members could have reasonably been on notice about the actual or potential presence of PFAS in Defendant's Strawberries.

183.   Plaintiffs and other Class members exercised reasonable diligence but could not discover PFAS or Defendant's wrongful conduct, because, as demonstrated supra, Defendant's wrongful acts were concealed from Plaintiff and the public, and facts pertinent to same were within Defendant's possession and control.

184.   Alternatively, any statute of limitation or prescriptive period is equitably tolled because of fraudulent concealment. Defendant affirmatively concealed from Plaintiffs and other Class members its unlawful conduct. Defendant affirmatively strove to avoid disclosing its knowledge of its wrongful conduct, and of the fact that PFAS was used and present in the Strawberries.

185.   Defendant continued to publicly represent that the Strawberries were high quality, merchantable, and did not contain any dangerous undisclosed substances.

186.   Because of this, Plaintiffs and other Class members did not discover, nor could they have discovered through reasonable and ordinary diligence, Defendant's deceptive and unlawful conduct alleged herein. Defendant's misleading partial disclosures lulled Plaintiffs and

CLASS ACTION COMPLAINT

Class members into believing that the prices paid for Defendant's Strawberries were appropriate despite their exercise of reasonable and ordinary diligence.

187.　As a result of Defendant's affirmative and other acts of concealment, any applicable statutes of limitations affecting the rights of Plaintiffs and other Class members has been tolled.

188.　Plaintiffs and other Class members exercised reasonable diligence by, among other things, upon learning of the true facts, promptly investigating and bringing the allegations contained herein.

189.　Despite these or other efforts, Plaintiffs was unable to discover, and could not have discovered, the unlawful conduct alleged herein at the time it occurred or at an earlier time so as to enable any complaint to be filed sooner.

## VI.　CLASS ALLEGATIONS

190.　Plaintiffs bring this action both individually and on behalf of the following classes (collectively, the "Classes," each a "Class").

191.　Plaintiffs Washington, Duxler, and Hammersmith (collectively the "Illinois Plaintiffs") bring this action individually and on behalf of the following Class pursuant to Rules 23(a) 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons residing in Illinois who, during the applicable limitations period through the earlier of (i) the date on which Defendant ceases the deceptive representations, omissions, or misleading partial disclosures alleged herein, or (ii) the date of class certification, purchased Driscoll's Strawberries as a consumer, and not for resale (the "Illinois Class").

192.　Plaintiff Khangi brings this action individually and on behalf of the following Class pursuant to Rules 23(a) 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons residing in New York who, during the applicable limitations period through the earlier of (i) the date on which Defendant ceases the deceptive representations, omissions, or misleading partial disclosures alleged herein, or (ii) the date of class certification, purchased Driscoll's Strawberries as a consumer, and not for resale (the "New York Class").

193.　Plaintiff Weins brings this action individually and on behalf of the following Class pursuant to Rules 23(a) 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

CLASS ACTION COMPLAINT

> All persons residing in Massachusetts who, during the applicable limitations period through the earlier of (i) the date on which Defendant ceases the deceptive representations, omissions, or misleading partial disclosures alleged herein, or (ii) the date of class certification, purchased Driscoll's Strawberries for personal, family, or household use, and not for resale (the "Massachusetts Class").

194.    Plaintiff Berlinger brings this action individually and on behalf of the following Class pursuant to Rules 23(a) 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons residing in New Jersey who, during the applicable limitations period through the earlier of (i) the date on which Defendant ceases the deceptive representations, omissions, or misleading partial disclosures alleged herein, or (ii) the date of class certification, purchased Driscoll's Strawberries as a consumer, and not for resale (the "New Jersey Class").

195.    Excluded from the Classes are: (a) any judge or magistrate presiding over this action, and members of their families; (b) Defendant and its employees, officers, directors, and agents; (c) Defendant's legal representatives, assigns, and successors; and (d) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

196.    Plaintiffs reserve the right to narrow or expand the foregoing Classes definitions, or to create or modify subclasses as the Court deems necessary.

197.    Driscoll's challenged conduct occurred in Illinois, New York, Massachusetts, and New Jersey and Plaintiffs claims arise from uniform marketing, branding, labeling, packaging, advertising, and omission practices disseminated to consumers throughout the United States, including in in Illinois, New York, Massachusetts, and New Jersey.

198.    Driscoll's marketed and sold its Strawberries in Illinois, Massachusetts, New Jersey, and New York using substantially uniform representations emphasizing safety, wholesomeness, sustainability, rigorous food safety standards, integrated pest management practices, and reductions in synthetic pesticide use.

199.    The alleged omissions and deceptive practices likewise emanated from centralized and uniform corporate conduct, policies, and marketing decisions controlled by Defendant.

200.    Consumers in Illinois, Massachusetts, New Jersey, and New York purchased Defendant's Strawberries in reliance on the same or substantially similar representations,

CLASS ACTION COMPLAINT

misleading partial disclosures, and omissions and suffered similar economic injuries in the form of price premiums paid for Strawberries allegedly worth less than represented.

201. This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

202. **Numerosity:** While the exact number of Class members cannot be determined without discovery, they are believed to consist of potentially millions of consumers nationwide. The Class is therefore so numerous that joinder of all members is impracticable.

203. **Commonality:** Common questions of law and fact exist as to all Class Members, including, but not limited to:

   a. Whether Defendant's Strawberries contained undisclosed PFAS;

   b. Whether Defendant falsely represented that its Strawberries were merchantable, fit for intended purposes, and otherwise of the quality and composition represented;

   c. Whether Defendant owed a duty to disclose;

   d. Whether Defendant's partial disclosures that its Strawberries were "safe," "wholesome" and "sustainably sourced" were misleading;

   e. Whether Defendant knew or should have known that the Strawberries contained or had a risk of containing PFAS;

   f. Whether Defendant omitted facts regarding its manufacture, sale, or testing of its Strawberries;

   g. Whether Defendant's omissions were material to Plaintiffs, the Class, or a reasonable consumer;

   h. Whether Defendant's packaging is false, deceptive, misleading, or likely to deceive;

   i. Whether Plaintiffs and other Class members have been economically damaged as a result of Defendant's unlawful conduct, and the amount of their damages';

CLASS ACTION COMPLAINT

j.        The scope of injunctive relief; and

k.        Whether Defendant fraudulently concealed Plaintiff's and other Class members' causes of action.

204.    **Typicality:** Plaintiffs' claims are typical of other Class members' claims. Plaintiff and other Class members all suffered the same type of economic harm. Plaintiffs have substantially the same interest in this matter as all other Class members, and their claims arise out of the same set of facts and conduct as the claims of all other Class members.

205.    **Adequacy of Representation:** Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in complex consumer fraud litigation, class actions. Accordingly, Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of other Class members. Plaintiffs' claims are coincident with, and not antagonistic to, those of the other Class members they seek to represent. Plaintiffs have no disabling conflict with other Class members and will fairly and adequately represent the interests of Class members.

206.    Defendant has acted on grounds that apply generally to all Class members so that preliminary and/or final injunctive relief and corresponding declaratory relief are appropriate respecting the Class as a whole given the cohesiveness of the issues presented.

207.    The common questions of law and fact enumerated above predominate over the questions affecting only individual Class members, and a class action is the superior method for fair and efficient adjudication of the controversy. Although many other Class members have claims against Defendant, the likelihood that individual Class members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues would not be efficient, timely, or proper. Judicial resources would be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of thousands of claimants in one suit would be impractical or impossible. In addition, individualized rulings and judgments could result in inconsistent relief for similarly situated plaintiffs. Plaintiffs' counsel, experienced in complex consumer litigation, and class actions, foresee little difficulty in the managing this case as a class action.

## VII.  CLAIMS FOR RELIEF

### COUNT ONE

**Violation of Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. § 505/1, *et seq*. (the "ICFA"), Against Defendant (on Behalf of the Illinois Plaintiffs and the Illinois Class)**

208.  Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1–207, as though fully set forth herein.

209.  Defendant, the Illinois Plaintiffs and the Illinois Class members are each a "person" within the meaning of 815 Ill. Comp. Stat. § 505/1(c).

210.  Driscoll's Strawberries are "merchandise" within the meaning of 815 Ill. Comp. Stat. § 505/1(b).

211.  There was a sale of merchandise from Defendant to the Illinois Plaintiffs and the Illinois Class members, as defined by 815 Ill. Comp. Stat. § 505/1(d).

212.  Illinois's Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. § 505/1, *et seq*. (the "ICFA") makes "it unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices," including the "concealment, suppression, or omission of any material fact."

213.  Defendant willingly engaged in unfair methods of competition and unfair or deceptive acts or practices, in violation of the ICFA, by failing to disclose the presence or risk of PFAS and/or PFAS-related compounds in the Strawberries and instead relied on misleading and deceptive omissions and environmental features of the Strawberries.

214.  The Illinois Plaintiffs and members of the Illinois Class relied on Defendant's omissions, active concealment, and other deceptive conduct regarding the presence or material risk of PFAS in the Strawberries when deciding to purchase the Strawberries, unaware of the undisclosed material facts.

215.  Defendant intended that the Illinois Plaintiffs and members of the Illinois Class would rely on its Omissions, active concealment, and other deceptive conduct regarding the presence or material risk of PFAS in the Strawberries when deciding to purchase the Strawberries, unaware of the undisclosed material facts.

216. The facts concealed or not disclosed by Defendant were material facts in that the Illinois Plaintiffs and members of the Illinois Class, and other reasonable consumers would have considered them important in deciding whether to purchase the Strawberries. Had the Illinois Plaintiffs and members of the Illinois Class known the Strawberries contained (or had a material risk of containing) PFAS, they would not have purchased the Strawberries or paid the price that they paid.

217. Defendant's omissions, active concealment, and other deceptive conduct as described herein repeatedly occurred in the course of Defendant's business, trade or commerce and were capable of deceiving a substantial portion of the consuming public.

218. Defendant's omissions, active concealment, and other deceptive conduct as described herein were consumer-oriented.

219. Defendant's omissions, active concealment, and other deceptive conduct as described herein were likely to mislead a reasonable person purchasing the Strawberries.

220. Defendant's omissions, active concealment, and other deceptive conduct caused the Illinois Plaintiffs and members of the Illinois Class to suffer injury in the form of actual damages when they purchased the Strawberries that were worth less than the price they paid and that they would not have purchased had they known the Strawberries contained (or had a material risk of containing) PFAS.

221. As a direct and proximate result of Defendant's conduct as set forth above, the Illinois Plaintiffs and the Illinois Class are entitled to actual damages, compensatory damages, penalties, attorneys' fees, and costs as set forth in 815 Ill. Comp. Stat. § 505/10(a). Defendant's deceptive, misleading, unfair, and unconscionable conduct as set forth above were done willfully, wantonly, and maliciously, thus entitling the Illinois Plaintiffs and the Illinois Class to an award of punitive damages.

CLASS ACTION COMPLAINT

## COUNT TWO

**Violations of New York's Deceptive Practices Act, N.Y. Gen. Bus. Law § 349, Against Defendant (on Behalf of Khangi and the New York Class)**

222.  Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1–207, as though fully set forth herein.

223.  New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

224.  In their sale of goods throughout New York, Defendant conducts business and trade within the meaning and intention of New York General Business Law § 349.

225.  Defendant intentionally represented that the Strawberries were of a particular standard, grade, or quality when they in fact included undisclosed levels of PFAS and/or PFAS-related compounds and were not safe for consumption.

226.  The facts that Defendant concealed or misrepresented were material in that Khangi and the New York Class members, and any other reasonable consumer would have considered them when deciding whether to purchase the Strawberries.

227.  Defendant's conduct and Omissions described herein repeatedly occurred in the course of Defendant's business and were capable of deceiving a substantial portion of the consuming public, including Khangi and the New York Class members.

228.  Defendant has engaged and continue to engage in deceptive conduct in violation of the New York General Business Law.

229.  Defendant's deceptive acts or practices resulted in Khangi and the New York Class members and other reasonable consumers suffering actual damages when they purchased the Strawberries that were worth less than the price paid and that they would not have purchased Strawberries that contained (or had a material risk of containing) PFAS.

230.  Defendant intended for Khangi and the New York Class members and other reasonable consumers to rely on their Omissions and conduct when they decided to purchase the Strawberries.

231.  As a direct and proximate result of these violations, Khangi and the New York Class members and other reasonable consumers have been harmed, and that harm will continue

unless the Court orders Defendants to disclose that the Strawberries contain (or had a material risk of containing) PFAS and are enjoined from misrepresenting the quality and ingredients of the Strawberries described herein.

232. Pursuant to N.Y. Gen. Bus. Law § 349(h), Khangi and the New York Class members seek injunctive and declaratory relief, full refund, actual and punitive damages, statutory damages, and attorneys' fees.

## COUNT THREE

**Violations of New York's Deceptive Practices Act, N.Y. Gen. Bus. Law § 350, (Against Defendant on Behalf of Khangi and the New York Class)**

233. Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1–207, as though fully set forth herein.

234. The Strawberries packaging is deceptive and materially misleading because Defendant failed to disclose the inclusion (or risk of inclusion) of PFAS in the Strawberries.

235. The inclusion (or risk of inclusion) of PFAS in the Strawberries is material information to consumers like Khangi and the New York Class members. Defendant omitted this material information knowingly, willfully, wantonly, and with reckless disregard for the truth.

236. Khangi and the New York Class members were induced to purchase the Strawberries by Defendant's, to which all consumers are exposed. Khangi and the New York Class have been injured as a result of their reliance on the Strawberries packaging and have received less than what they bargained for.

237. Pursuant to N.Y. Gen. Bus. Law § 350(e), Khangi and the New York Class members seek injunctive and declaratory relief, full refund, actual and punitive damages, statutory damages, and attorneys' fees.

## COUNT FOUR

**Violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 *et seq*. (On Behalf of Berlinger and the New Jersey Class)**

238. Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1–207 as though fully set forth herein.

239. Defendant, Berlinger, and the New Jersey Class members are each a "person" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

240. Driscoll's Strawberries are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

241. A sale of merchandise occurred from Defendant to Berlinger and the New Jersey Class members within the meaning of N.J. Stat. Ann. § 56:8-1(e).

242. The New Jersey Consumer Fraud Act prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact." N.J. Stat. Ann. § 56:8-2.

243. Defendant knowingly engaged in unconscionable commercial practices in violation of the NJCFA by failing to disclose the presence or material risk of PFAS and/or PFAS-related compounds in the Strawberries and by relying on misleading omissions and representations regarding the quality, safety, and characteristics of the Strawberries.

244. Berlinger and the New Jersey Class members relied on Defendant's omissions, active concealment, and deceptive conduct regarding the presence or material risk of PFAS in the Strawberries when deciding to purchase the Strawberries.

245. Defendant intended that New Jersey consumers like Berlinger and the New Jersey Class members would rely on its omissions, active concealment, and deceptive conduct regarding the presence or material risk of PFAS in the Strawberries.

246. The concealed facts were material because Berlinger and members of the New Jersey Class, and other reasonable consumers, would have considered them important in deciding whether to purchase the Strawberries. Had they known the Strawberries contained, or had a material risk of containing, PFAS, they would not have purchased the Strawberries or would have paid less for them.

247. Defendant's omissions and deceptive conduct occurred repeatedly in the course of Defendant's business, trade, and commerce and were capable of deceiving a substantial portion of the public.

248. Defendant's conduct occurred in trade or commerce within the meaning of N.J. Stat. Ann. § 56:8-1(e).

249. Defendant's omissions were likely to mislead a reasonable consumer like Berlinger and members of the New Jersey Class who purchased the Strawberries.

250. Defendant's conduct caused ascertainable loss to Berlinger and the New Jersey Class members when they purchased Strawberries that were worth less than the price they paid and that they would not have purchased had they known the Strawberries contained, or had a material risk of containing, PFAS.

251. As a direct and proximate result of Defendant's violations of the NJCFA, Berlinger and the New Jersey Class are entitled to actual damages, treble damages, attorneys' fees, and costs pursuant to N.J. Stat. Ann. § 56:8-19. Defendant's deceptive, unfair, and unconscionable conduct was willful and knowing, entitling Berlinger and the New Jersey Class to treble damages.

## COUNT FIVE

**Violation of Massachusetts General Laws Chapter 93A, §§ 2 & 9 (On Behalf of Weins and the Massachusetts Class)**

252. Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1–207 as though fully set forth herein.

253. Defendant, Weins, and the Massachusetts Class members are "persons" engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A § 1(b).

254. Driscoll's Strawberries constitute "goods" and "services" offered in trade or commerce within the meaning of Chapter 93A.

255. A sale of goods occurred from Defendant to Weins and the Massachusetts Class members within the meaning of Chapter 93A.

256. Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A § 2(a).

257. Defendant knowingly engaged in unfair and deceptive acts in violation of Chapter 93A by failing to disclose the presence or material risk of PFAS and/or PFAS-related compounds

in the Strawberries and by relying on misleading omissions and representations regarding the quality, safety, sustainability, and characteristics of the Strawberries.

258. Weins and the Massachusetts Class members relied on Defendant's omissions, active concealment, and deceptive conduct regarding the presence or material risk of PFAS in the Strawberries when deciding to purchase the Strawberries.

259. Defendant intended that Massachusetts consumers rely on its omissions, active concealment, and deceptive conduct regarding the presence or material risk of PFAS in the Strawberries.

260. The concealed facts were material because Weins and members of the Massachusetts Class members, and other reasonable consumers, would have considered them important in deciding whether to purchase the Strawberries. Had they known the Strawberries contained, or had a material risk of containing, PFAS, they would not have purchased the Strawberries or would have paid less for them.

261. Defendant's omissions and deceptive conduct occurred repeatedly in the course of Defendant's business, trade, and commerce and were capable of misleading a substantial portion of the public.

262. Defendant's conduct occurred in trade or commerce within the meaning of Mass. Gen. Laws ch. 93A § 1(b).

263. Defendant's conduct caused economic injury to Weins and the Massachusetts Class members when they purchased Strawberries that were worth less than the price they paid and that they would not have purchased had they known the Strawberries contained, or had a material risk of containing, PFAS.

264. As a direct and proximate result of Defendant's violations of Chapter 93A, Weins and the Massachusetts Class members are entitled to actual damages, statutory damages, attorneys' fees, and costs pursuant to Mass. Gen. Laws ch. 93A § 9(3). Defendant's unfair and deceptive conduct was willful and knowing, entitling Weins and the Massachusetts Class to double or treble damages under Chapter 93A.

265.   No pre-suit demand letter is required because this action is brought as a class action. Mass. Gen. Laws ch. 93A § 9(2).

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs, individually and on behalf and all others similarly situated, pray for judgment against Driscoll's as to each and every count, including:

A.   An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendant to bear the costs of class notice;

B.   An order enjoining Defendant from selling the Strawberries until the PFAS and/or PFAS-related compounds are removed or full disclosure of the presence of such appears in all marketing and packaging;

C.   An order enjoining Defendant from selling the Strawberries until the misleading partial disclosures and omissions are disclosed;

D.   An order enjoining Defendant from selling the Strawberries in any manner suggesting or implying that they are beneficial to the health of consumers and the environment;

E.   An order requiring Defendant to engage in a corrective marketing campaign and engage in any further necessary affirmative injunctive relief;

F.   An order awarding declaratory relief, and any further injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's conduct;

G.   An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading marketing and packaging, or a violation of the state laws, plus pre- and post-judgment interest thereon;

H.   An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

J.   An order requiring Defendant to pay punitive damages on any count so allowable;

K.   An order awarding attorneys' fees and costs to Plaintiffs and the Classes; and

L.   An order providing for all other such equitable relief as may be just and proper.

CLASS ACTION COMPLAINT

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 26, 2026                              Respectfully Submitted,

**GRANT & EISENHOFER P.A.**

By: /s/ Jennifer Sarnelli
Jennifer Sarnelli (#242510)
Thomas Walsh*
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: (646) 722-8504
Facsimile: (646) 722-8501
Email:  jsarnelli@gelaw.com
             twalsh@gelaw.com

M. Elizabeth Graham (#143085)
2325 Third Street, Suite 329
San Francisco, CA 94107
Telephone: (415) 229-9720
Email: egraham@gelaw.com

-and-

Kelly L. Tucker*
Chad B. Holtzman*
123 Justison Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 622-7109
Facsimile: (302) 622-7100
Email:  ktucker@gelaw.com
             choltzman@gelaw.com

**SEEGER WEISS LLP**

Stephen A. Weiss*
Scott Alan George*
Justin M. Smigelsky*
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: 973-584-9393
Email:    sweiss@seegerweiss.com
             jsmigelsky@seegerweiss.com

**HECHT PARTNERS LLP**

Rebecca A. Peterson (#241858)
Krista K. Freier*
1650 W. 82nd Street, Ste. 880
Bloomington, MN 55431
Telephone: (612) 778-9595
Facsimile: (888) 421-4173

64
CLASS ACTION COMPLAINT

Email:   rpeterson@hechtpartners.com
              kfreier@hechtpartners.com

-and-

Janine L. Pollack*
Lori G. Feldman*
125 Park Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 851-6821
Facsimile: (888) 421-4173
Email:   jpollack@hechtpartners.com
              lfeldman@hechtpartners.com

*pro hac vice application forthcoming

CLASS ACTION COMPLAINT